IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
7:14-CV-279-D

| | |
|---|---|
| CALVIN L. PARKER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **MEMORANDUM AND** |
| v. ) | **RECOMMENDATION** |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

In this action, plaintiff Calvin L. Parker ("plaintiff" or, in context, "the claimant") challenges the final decision of defendant Acting Commissioner of Social Security Carolyn W. Colvin ("Commissioner") denying his application for supplemental security income ("SSI") on the grounds that he is not disabled. The case is before the court on the parties' respective motions for judgment on the pleadings (D.E. 20, 22). Each party filed a memorandum in support of its motion (D.E. 21, 23), and plaintiff filed a response (D.E. 24) to the Commissioner's motion. The motions were referred to the undersigned Magistrate Judge for a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* D.E. 25). For the reasons set forth below, it will be recommended that plaintiff's motion be granted, the Commissioner's motion be denied, and this case be remanded for further proceedings.

## BACKGROUND

**I.  CASE HISTORY**

On 24 August 2011, plaintiff filed an application for SSI, alleging a disability onset date of 29 July 2011. Tr. 12. The application was denied initially and upon reconsideration, and a request for hearing was timely filed. Tr. 12. On 18 June 2013, a hearing was held before an

ALJ, at which plaintiff and a vocational expert testified. Tr. 23-43. The ALJ issued a decision denying plaintiff's claim on 16 August 2013. Tr. 12-20. Plaintiff timely requested review by the Appeals Council. Tr. 8. The Appeals Council denied the request on 30 September 2014. Tr. 1-5. At that time, the decision of the ALJ became the final decision of the Commissioner. 20 C.F.R. § 416.1481. Plaintiff commenced this proceeding for judicial review on 2 December 2014, pursuant to 42 U.S.C. § 405(g). (*See In Forma Pauperis* ("IFP") Mot. (D.E. 1); Order Allowing IFP Mot. (D.E. 5); Compl. (D.E. 6)).

## II. STANDARDS FOR DISABILITY

The Social Security Act ("Act") defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). "[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B). The Act defines a physical or mental impairment as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

The disability regulations under the Act ("Regulations") provide a five-step analysis that the ALJ must follow when determining whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 416.909, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in [20 C.F.R. pt. 404, subpt. P, app. 1] ["Listings"] . . . and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity ["RFC"] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . . .

20 C.F.R. § 416.920(a)(4).

The burden of proof and production rests with the claimant during the first four steps of the analysis. *Pass*, 65 F.3d at 1203. The burden shifts to the Commissioner at the fifth step to show that alternative work is available for the claimant in the national economy. *Id.*

In the case of multiple impairments, the Regulations require that the ALJ "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 416.923. If a medically severe combination of impairments is found, the combined impact of those impairments will be considered throughout the disability determination process. *Id.*

### III. FINDINGS OF THE ALJ

Plaintiff was 44 years old on the date that the application was filed and 46 years old on the date of the administrative hearing. Tr. 19 ¶ 6. The ALJ found that he has at least a high

school education and past relevant work as a food service worker, painter, and retail sales store laborer. Tr. 19 ¶¶ 5, 7; 34-35 (plaintiff's testimony that he obtained a GED).

Applying the five-step analysis of 20 C.F.R. § 416.920(a)(4), the ALJ found at step one that plaintiff had not engaged in substantial gainful activity since the 24 August 2011 application date. Tr. 14 ¶ 1. At step two, the ALJ found that plaintiff had the following medically determinable impairments that were severe within the meaning of the Regulations: depression, post-traumatic stress disorder, history of traumatic brain injury, psychotic disorder, left shoulder impingement, migraines, schizoaffective disorder, and history of alcohol dependence. Tr. 14 ¶ 2. At step three, the ALJ found that plaintiff's impairments did not meet or medically equal any of the Listings. Tr. 14 ¶ 3.

The ALJ next determined that plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 416.967(b)—that is, lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds—with limitations. Tr. 16 ¶ 4.[1] The limitations are as follows:

> The claimant must avoid hazardous exposure to heights and machinery. He is limited to simple, routine, and repetitive tasks. He requires low-production work with no complex decisionmaking or crisis situations. He can frequently, not constantly, reach overhead with his left extremity. In addition, he is limited to occasional contact with coworkers and no contact with the general public.

Tr. 16 ¶ 4.

Based on his determination of plaintiff's RFC, the ALJ found at step four that plaintiff was not capable of performing his past relevant work. Tr. 19 ¶ 5. At step five, the ALJ accepted the testimony of the vocational expert and found that there were jobs in the national economy existing in significant numbers that plaintiff could perform, including jobs in the occupations of

---

[1] *See also Dictionary of Occupational Titles* (U.S. Dep't of Labor 4th ed. rev. 1991) ("DOT"), app. C § IV, def. of "L-Light Work," http://www.oalj.dol.gov/libdot.htm (last visited 4 Nov. 2015). "Light work" and the other terms for exertional level as used in the Regulations have the same meaning as in the DOT. *See* 20 C.F.R. § 416.967.

router, postal mail clerk, and sorter. Tr. 20 ¶ 9. The ALJ accordingly concluded that plaintiff was not disabled from 24 August 2011, the application date, implicitly through 16 August 2013, the date of his decision. Tr. 20 ¶ 10.

IV.     STANDARD OF REVIEW

Under 42 U.S.C. §§ 405(g) and 1383(c)(3), judicial review of the final decision of the Commissioner is limited to considering whether the Commissioner's decision is supported by substantial evidence in the record and whether the appropriate legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Unless the court finds that the Commissioner's decision is not supported by substantial evidence or that the wrong legal standard was applied, the Commissioner's decision must be upheld. *See Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Perales*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is more than a scintilla of evidence, but somewhat less than a preponderance. *Id.*

The court may not substitute its judgment for that of the Commissioner as long as the decision is supported by substantial evidence. *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). In addition, the court may not make findings of fact, revisit inconsistent evidence, or make determinations of credibility. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979). A Commissioner's decision based on substantial evidence must be affirmed, even if the reviewing court would have reached a different conclusion. *Blalock*, 483 F.2d at 775.

Before a court can determine whether a decision is supported by substantial evidence, it must ascertain whether the Commissioner has considered all relevant evidence and sufficiently explained the weight given to probative evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). "Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator." *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

## DISCUSSION

### I.  ALJ'S EVALUATION OF MEDICAL OPINIONS OF DR. KING

Plaintiff contends that the ALJ erred, in part, by not properly assessing the medical opinions of consulting examining psychologist Michele L. King, Psy.D. The court agrees.

#### A.  Applicable Legal Standards

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). An ALJ must consider all medical opinions in a case in determining whether a claimant is disabled. *See id.* § 416.927(b); *Nicholson v. Comm'r of Soc. Sec. Admin.*, 600 F. Supp. 2d 740, 752 (N.D.W. Va. 2009) ("Pursuant to 20 C.F.R. §§ 404.1527(b), 416.927(b), an ALJ must consider all medical opinions when determining the disability status of a claimant.").

The ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating

source's medical opinion and the reasons for that weight." Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *5 (2 July 1996); *see also* 20 C.F.R. § 416.927(c)(2); *Ashmore v. Colvin*, No. 0:11-2865-TMC, 2013 WL 837643, at *2 (D.S.C. 6 Mar. 2013) ("In doing so [*i.e.*, giving less weight to the testimony of a treating physician], the ALJ must explain what weight is given to a treating physician's opinion and give specific reasons for his decision to discount the opinion.").

The same basic standards that govern the evaluation of the opinions of treating medical sources not given controlling weight and the explanation of the weight given such opinions apply to the evaluation of opinions of examining, but nontreating sources. *See* 20 C.F.R. § 416.927(c); *Casey v. Colvin,* No. 4:14–cv–00004, 2015 WL 1810173, at *3 (W.D. Va. 12 Mar. 2015), *rep. & recommendation adopted by* 2015 WL 1810173, at *1 (21 Apr. 2015). More weight is generally given to the opinions of a treating source than to the opinions of a nontreating examining source. *See* 20 C.F.R. § 416.927(c)(2). Under appropriate circumstances, however, the opinions of a nontreating examining source may be given more weight than those of a treating source. *See*, *e.g.*, Soc. Sec. Ruling 96–6p, 1996 WL 374180, at *3 (2 July 1996).

The factors used to determine the weight to be accorded the opinions of physicians and psychologists (and other "acceptable medical sources") not given controlling weight also apply to the opinions of providers who are deemed to be at a different professional level, so-called "other sources," who include counselor and public welfare agency personnel. *See* Soc. Sec. Ruling 06-03p, 2006 WL 2329939, at *2, 4 (9 Aug. 2006); *see also* 20 C.F.R. § 416.913(d) (partial listing of "other sources"). As with opinions from physicians and psychologists, the ALJ must explain the weight given opinions of other sources and the reasons for the weight given. *See* Soc. Sec. Ruling 06-03p, 2006 WL 2329939, at *6; 20 C.F.R. § 416.927(e)(2)(ii). The fact that an opinion is from an acceptable medical source may justify giving that opinion greater

weight than an opinion from a source that is not an acceptable medical source, although circumstances can justify giving opinions of sources that are not acceptable sources greater weight. Soc. Sec. Ruling 06-03p, 2006 WL 2329939, at *5.

**B.    Analysis**

On 7 January 2012, Dr. King conducted a comprehensive clinical psychological evaluation of plaintiff. (*See* Tr. 308-12). In her report, Dr. King recites plaintiff's reported history of three head injuries between ages 11 and 13. Tr. 309-10. She continues, in part:

> Mr. Parker was psychiatrically hospitalized this past year when he had a psychotic episode while at Easter Seals seeing his doctor. He said this was his worst psychotic episode that he has had and he was not in touch with reality at the time. However, Mr. Parker indicated that he has been seeing and hearing things since a teenager, specifically ever since his head injuries as a young adolescent. . . . Mr. Parker said he has spent the majority of his adolescence and adult life trying to hide his hallucinations as well as his mood and temper troubles. He said it is getting harder to control now.
>          . . . .
> There was no evidence of hallucination, delusions or paranoia *during the evaluation*.

Tr. 311-12 (emphasis added).

Dr. King summarized her assessment as follows:

Mr. Parker is a 44-year-old African American male recently released from his first psychiatric hospitalization. He was decompensating and hallucinating while in his psychiatrist's office. Mr. Parker and his providers have been working on getting him a stable and low cost medication regimen. *Mr. Parker is currently having some difficulties interacting with others given his psychiatric issues and stopped working when he became unstable*. Mr. Parker has had longstanding difficulties with hallucinations and mood control and he also has a history of head injury and it appears that his difficulties have compounded recently resulting in his inability to stay employed. *Mr. Parker would not be able to presently tolerate the stress of day-to-day work or be able to interact effectively with coworkers or supervisors*. He is able to understand and retain instructions, but he does have some difficulty sustaining attention on tasks. He does well with simple attention and concentration, but more complex tasks or multitasking are somewhat difficult for him. Mr. Parker may need assistance managing funds in his best interest given his history of alcohol dependence as well as his mood concerns.

Tr. 311-12 (emphasis added). She also gave plaintiff a global assessment of functioning ("GAF") score of 60, which equates to moderate symptoms.[2] Dr. King did not herself reconcile the GAF score and her opinions suggesting greater functional limitations.

In his decision, the ALJ described Dr. King's evaluation as follows:

> On January 7, 2012, the claimant visited Michelle King, Psy.D., for a psychological consultative examination (Exhibit 6F). The claimant reported a history of mental impairments with only one recent psychiatric hospitalization. He reported some problems interacting with others and mood control. Upon examination, however, Dr. King reported the claimant was cooperative, pleasant, goal-directed, and coherent. There was no evidence of hallucination, delusions,

---

[2] The GAF scale measures a person's overall psychological, social, and occupational functioning. Am. Psych. Assn., *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. text rev. 2000) ("DSM–IV–TR"). Selected GAF scores have the following meanings:

> 90-81 Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members).
>
> 80-71 If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork).
>
> 70-61 Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.
>
> 60-51 Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).
>
> 50-41 Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).
>
> 40-31 Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).
>
> 30-21 Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

DSM–IV–TR 34.

> or paranoia. The claimant also exhibited good memory and responded
> appropriately to internal stimuli. Based on these findings, Dr. King diagnosed the
> claimant with mood disorder and assessed the claimant with a global assessment
> functioning (GAF) score of 60, which indicated only moderate limitations in
> functioning (Exhibit 6F).

Tr. 17 ¶ 5.

As can be seen, the ALJ's characterization of Dr. King's report is relatively benign. In particular, he omits any explicit reference to plaintiff's hallucinations other than to say there was no evidence of them. He does not indicate that Dr. King limited that finding to the time of the evaluation. More troubling, the ALJ does not mention Dr. King's opinions that plaintiff was unable to "tolerate the stress of day-to-day work" or "to interact effectively with coworkers or supervisors." Tr. 312. Notwithstanding these opinions, the ALJ focuses on the moderate-symptoms GAF score Dr. King gave plaintiff. The ALJ's characterization of Dr. King's report raises concern that his assessment of her opinions is grounded in a selective reading of her report.

> The ALJ's assessment of Dr. King's opinions confirms this concern. He states:
>
> Dr. King opined the claimant may have some difficulty interacting with others,
> but he is able to understand and retain instructions and does well with simple
> attention and concentration. Dr. King also opined the claimant only has moderate
> limitations in functioning based on his GAF score of 60 (Exhibit 6F). The
> undersigned gives these opinions some weight because they are mostly supported
> by the objective medical findings and are consistent with the claimant's reported
> daily activities.

Tr. 18 ¶ 5.

As in his earlier description of Dr. King's report, the ALJ fails here to mention Dr. King's opinions that plaintiff was not able to handle the stress of day-to-day work or to interact effectively with coworkers or supervisors. He actually misrepresents Dr. King as opining merely that plaintiff "may" have some difficulty interacting with others. Again, Dr. King explicitly

found that plaintiff "is currently having some difficulties interacting with others" and "would not . . . be able to interact effectively with coworkers and supervisors." Tr. 311, 312. The fact that the ALJ never mentions Dr. King's opinions on plaintiff's ability to handle stress and interact with coworkers and supervisors leaves open the question whether he considered them at all. He certainly failed to meet his obligation to state and explain the weight he gave these opinions.

In light of Dr. King's explicit opinion that plaintiff had functional limitations that prevented him from working, the ALJ's further finding that Dr. King "opined the claimant only has moderate limitations in functioning based on his GAF score of 60" is at least incomplete. The ALJ needed to explain how he arrived at this conclusion notwithstanding Dr. King's opinions of more severe limitations.

The ALJ's finding that plaintiff's reported daily activities are "consistent" with the purported opinions of Dr. King that he sets out adds scant support to his analysis. The ALJ summarized plaintiff's testimony about his daily activities as follows:

> The claimant reported he lives with a friend. Although he testified his friend performs all of the household chores and cooking, he reported he is capable of basic self-care needs. He testified he watches television on a daily basis and routinely attends doctors' appointments (Testimony).

Tr. 18 ¶ 5 (referring to Tr. 30-33). Even on the basis of this description of plaintiff's testimony, it is apparent that plaintiff's reported daily activities are minimal. The ability to meet self-care needs, watch television daily, and routinely attend doctor appointments may arguably be "consistent" with moderate functional limitations in that a person with moderate limitations may be able to perform these functions. But these activities could likely also be performed by a person with substantially greater limitations in functioning. As detailed below, the ALJ's description of plaintiff's testimony regarding his activities of daily living significantly understates his reported limitations in daily functioning.

The ALJ did, of course, include restrictions in his RFC determination responsive to plaintiff's limitations in social functioning (*i.e.*, occasional contact with coworkers and no contact with the general public) and arguably stress (*e.g.*, no crisis situations). But because the ALJ failed to address the opinions in these areas by Dr. King, the court cannot determine whether he considered these opinions and, if he did, how much weight he accorded them in his analysis. The court is thereby precluded from determining whether the ALJ's decision is supported by substantial evidence. Moreover, it is conceivable that proper consideration of Dr. King's opinions would have produced a different outcome. The deficiencies in the ALJ's assessment of Dr. King's opinions are accordingly not harmless and require remand. *See*, *e.g.*, *Suggs v. Astrue*, No. 4:11-CV-128-FL, 2013 WL 466406, at *4 (E.D.N.C. 7 Feb. 2013) (holding that errors in Social Security cases are harmless if it is inconceivable that a different conclusion would have been reached without the errors).

## II. ALJ'S CHERRY PICKING

Plaintiff argues that the ALJ erred by "cherry picking" evidence—that is, improperly minimizing or disregarding in his analysis evidence tending to show that plaintiff had greater limitations than the ALJ found. *See*, *e.g.*, *Langevin v. Colvin*, No. 7:13-CV-65-BO, 2014 WL 4384679, at *2 (E.D.N.C. 2 Sept. 2014); *Hudson v. Colvin*, No. 7:12–CV–269–FL, 2013 WL 6839672, at *8 (E.D.N.C.), *mem. & recomm. adopted by* 2013 WL 6839672, at *1 (23 Dec. 2013). Again, the court agrees.

The ALJ's cherry picking manifested itself in his assessment of Dr. King's opinions, as discussed above. It is also apparent in the ALJ's characterization of plaintiff's testimony regarding his activities of daily living. The ALJ omitted reference to portions of plaintiff's

testimony showing that his reported limitations are substantially greater than represented by the ALJ.

For example, while the ALJ stated that plaintiff reported that "he is capable of basic self-care needs" (Tr. 18 ¶ 4), plaintiff actually testified as follows:

> Q      All right. You get up in the morning, sir. Are you able to get yourself in and out of the shower, get dressed and take care of your personal needs?
> A      A lot of my days, no.
> Q      Okay. On days when you say no, tell me the reasons why you can't?
> A      Pain, I've got a lot of pain in my back --
> Q      Okay.
> A      -- and my concentrations. And the night before not being able to sleep.

Tr. 31.

The ALJ stated that plaintiff testified that "he watches television on a daily basis." Tr. 18 ¶ 4. In fact, plaintiff testified, "I spend my days watching television," not simply that he watched television daily. Tr. 32. He went on to testify that he does so in his bedroom and stays there essentially the entire day:

> Q      So when you get up in the morning, sir, you go from your bedroom to your living room and just watch TV all day?
> A      No, I watch in the bedroom all day.
> Q      Okay. Do you ever leave the bedroom throughout the day?
> A      No, only to get glasses of water.
> Q      Okay. Your friend brings your meals to you in the room?
> A      Yes.

Tr. 33. Plaintiff also stated that he was unable to follow shows from beginning to end because of "little concentration" and that he changes channels, going "from show to show." Tr. 37.

With respect to doctor visits, plaintiff did testify that he went to doctors. Tr. 35. He further testified, though, that they were the only time he leaves the house. Tr. 35. Moreover, they do not appear to be frequent; he said he went "[a]t least twice a month." Tr. 35. Notably,

plaintiff also testified that he has in-home psychiatric care through "social services," presumably the county department of social services. Tr. 35. The ALJ nowhere mentions the in-home visits.

The ALJ's cherry picking is also evident in his handling of GAF scores. The only GAF score he cites in his decision is the 60 given him by Dr. King. There is no mention of lower scores given plaintiff: 40 on 22 August 2011 (Tr. 253); 45 on 16 November 2011 (Tr. 301); 45 on 30 November 2011 (Tr. 353); 55 on 11 January 2012 (Tr. 350); 55 on 20 February 2012 (Tr. 344); 55 on 12 March 2012 (Tr. 338); and 25 on 1 March 2013 (Tr. 429). These GAF scores were given by treating sources, whose opinions are generally entitled to more weight than those of consulting examining sources. *See* 20 C.F.R. § 416.927(c)(2).

In addition, the ALJ does not mention a set of documents relating to plaintiff from the North Carolina Division of Vocational Rehabilitation Services (Tr. 90-95) within the North Carolina Department of Health and Human Services ("NCDHHS"), nor does he cite to the exhibit containing these documents, Exhibit 8E. The set of documents consists of a "Progress Review" form dated 15 November 2011 (Tr. 190); an "Individualized Plan for Employment" dated 20 October 2011 (Tr. 191-92); a "Written Rehabilitation Analysis Page" ("WRAP") dated 20 October 2011 (Tr. 193); and a "Significant Disability Documentation" form ("SDD form") dated 11 October 2011 (Tr. 194-95). The documents identify Emily Neuenfeldt as plaintiff's counselor, presumably a vocational rehabilitation counselor. *See* Tr. 190, 192.

The SDD form found plaintiff to be "Most Seriously Disabled," having "<u>serious</u>" functional capacity limitations in the areas of interpersonal skills, self-direction, and work skills. Tr. 194. With respect to interpersonal skills, the SDD form found that plaintiff "cannot effectively handle anger, anxiety, frustration, or stress; does not avoid behaviors that result in adverse consequences; does not seek or accept social interaction with others; requires prescribed

14

medication in order to interact effectively with those around him"; with respect to self-direction, that he was "unable to concentrate for reasonable amounts of time without being easily distracted; cannot adjust to new situations without help"; and with respect to work skills, that he was "restricted from work in a stressful environment; [was] undependable/unreliable; [had a] history of job loss due to impairment." Tr. 194. The WRAP set out a similar assessment of plaintiff. *See* Tr. 193. Notably, a 23 March 2012 decision by NCDHHS finding plaintiff disabled for Medicaid purposes (Tr. 314-16) relies in part on the assessment of plaintiff by the Division of Vocational Rehabilitation Services (*see* Tr. 315 ¶ 5).[3] The ALJ was required to explain the weight he accorded the SDD form and the WRAP pursuant to Soc. Sec. Ruling 06-03p, 2006 WL 2329939, at *5-6, whether they are viewed as opinions from a so-called "other source" (*i.e.*, a rehabilitation counselor or public welfare agency official), the decision of another agency on disability, or both. *See*, *e.g.*, *Walton v. Astrue*, No. 7:09–CV–112–D, 2010 WL 2772498, at *1 (E.D.N.C. 9 July 2010) ("The problem, however, is that the ALJ said nothing [about the state DHHS Medicaid decision], and SSR–06–3p requires more than 'nothing.'").

The ALJ's cherry picking impacted his decision broadly. The areas affected include his credibility analysis, which relied on his assessment of Dr. King's opinions and plaintiff's reported activities of daily living, among other evidence; his RFC determination, which also relied on his assessment of Dr. King's opinions and plaintiff's reported activities of daily living; and his determination on the availability of other work to plaintiff, which, of course, relied on his

---

[3] For purposes of remand, the court notes that the Commissioner's characterization of the Medicaid decision in her memorandum is almost entirely inaccurate. (*See* Comm'r's Mem. 12). For example, contrary to the Commissioner's contention, the decision does identify specific factual limitations plaintiff was found to have. Tr. 315 ¶ 5. In addition, the decision found plaintiff disabled under Soc. Sec. Ruling 85-15, 1985 WL 56857 (1985), the citation to which is obstructed by the exhibit stamp the Social Security Administration placed on the document, not merely pursuant to 20 C.F.R. § 416.920(f) (describing step four in the sequential analysis). Tr. 316 ¶ 5. Indeed, the decision quotes, albeit without quotation marks, the paragraph of the ruling on which it relies. *See* Soc. Sec. Ruling 85-15, 1985 WL 56857, at *4, 3rd ¶.

15

RFC determination. The evidence the ALJ did not address—the lower GAF scores and vocational rehabilitation assessment—was also relevant to all these areas.

Particularly in light of its pervasive impact, the ALJ's cherry picking precludes the court from determining whether the ALJ's decision is supported by substantial evidence. Moreover, notwithstanding the restrictions included in the RFC determination, the court cannot dismiss the possibility that proper assessment of the evidence could have resulted in a different outcome in this case. The ALJ's cherry picking is therefore not harmless and provides an independent ground for remand. Because this error and the deficiencies found in the assessment of Dr. King's opinions are dispositive of this appeal, the court declines to address the other errors alleged by plaintiff.

## **CONCLUSION**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's motion (D.E. 20) for judgment on the pleadings be GRANTED, the Commissioner's motion (D.E. 22) for judgment on the pleadings be DENIED, and this case be REMANDED to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Recommendation. In making this recommendation, the court expresses no opinion on the weight that should be accorded any piece of evidence, matters that are for the Commissioner to resolve.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until 18 November 2015 to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept,

reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright v. Collins*, **766 F.2d 841, 846-47 (4th Cir. 1985).**

Any response to objections shall be filed within 14 days after the filing of objections.

This 4th day of November 2015.

_____
James E. Gates
United States Magistrate Judge